## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CHAD GAMBLE, | ) | CASE NO. 5:16CV2869 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Chad Gamble ("Plaintiff" or "Gamble"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) & 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In March 2013, Gamble filed applications for POD and DIB, alleging a disability onset

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

date of August 12, 2012[2] and claiming he was disabled due to depression, diabetes, and cellulitis.

(Transcript ("Tr.") 14, 200, 261.)  The applications were denied initially and upon

reconsideration, and Gamble requested a hearing before an administrative law judge ("ALJ").

(Tr. 14, 92-100, 102-108, 109.)

On February 11, 2015, an ALJ held a hearing, during which Gamble, represented by

counsel, and an impartial vocational expert ("VE") testified.  (Tr. 758-801.)  A supplemental

hearing was conducted on June 12, 2015, during which Gamble, represented by counsel, an

impartial VE, and a medical expert ("ME") testified.  (Tr. 33-59.)  On September 4, 2015, the

ALJ issued a written decision finding Gamble was not disabled.  (Tr. 14-31.)  The ALJ' s

decision became final on September 28, 2016, when the Appeals Council declined further

review.  (Tr. 1-6.)

On November 25, 2016, Gamble filed his Complaint to challenge the Commissioner's

final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14,

17, 18.)  Gamble asserts the following assignments of error:

---

[2] The Court notes there appears to be some confusion regarding the applicable onset date.
In Gamble's application, he alleges an onset date of August 12, 2012.  (Tr. 200.)
Subsequently, in a brief submitted to the ALJ after the February 2015 hearing, Gamble
sought to amend his onset date to January 1, 2013.  (Tr. 253.)  During the June 2015
hearing, however, both the ALJ and Gamble's counsel indicate the onset date is May 8,
2013.  (Tr. 36-39.)  Without explanation, the ALJ decision reverts to Gamble's originally
asserted onset date of August 12, 2012.  (Tr. 14-31.)  Neither party addresses this issue.
However, in his Brief on the Merits in this Court, Gamble asserts his onset date is May 8,
2013, and the Commissioner does not argue otherwise.  (Doc. No. 14 at 2, citing Tr. 39.)
As the ALJ accepted May 8, 2013 as Gamble's onset date during the June 2015 hearing
(and Medical Expert Dr. Andert therefore considered the relevant time period as
beginning on May 8, 2013 for purposes of his testimony), the Court will assume an onset
date of May 8, 2013 for purposes of this decision.  The Court construes the ALJ
decision's use of an August 2012 onset date to be a clerical error.

2

(1)     The ALJ's decision should be reversed because the ALJ failed to consider all of the opinion evidence.

(2)     The ALJ's decision should be reversed because he improperly characterized Mr. Gamble's anxiety as not a medically determinable impairment.

(Doc. No. 14.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Gamble was born in February 1971 and was forty-three (43) years-old at the time of his initial administrative hearing, making him a "younger" person  under social security regulations. (Tr. 26.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  He has at least a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a food/pizza deliverer.  (Tr. 26.)

### B.    Relevant Medical Evidence[3]

Gamble underwent a mental health assessment in November 2011 (a year and a half prior to his onset date) at Trillium Family Solutions.  (Tr. 330-340.)  He reported depression, sleep disturbance, difficulty concentrating, lack of motivation, social isolation, and feelings of worthlessness.  (Tr. 330.)  Gamble also reported a history of panic attacks "starting this year" with "no identifiable triggers to anxiety."  (*Id.*)  Gamble was diagnosed with major depressive disorder and anxiety disorder, not otherwise specified.  (Tr. 338.)  The therapist completing this assessment (whose name is illegible) found a Global Assessment of Functioning ("GAF") of 52,

---

[3]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Moreover, as Gamble's arguments relate solely to his mental impairments, the Court will only recite the medical evidence relevant to those impairments.

3

indicating moderate symptoms.[4]  (*Id.*)  It appears Gamble was thereafter prescribed Paxil.  *See e.g.*, Tr. 381, 383, 385.

In July 2012, Gamble presented to Paul E. Fracasso, D.O., for treatment of a physical health concern.  (Tr. 385-386.)  He reported his "anxiety has increased although his depression has been stable on his 30 mg of Paxil daily."  (*Id.*)  Dr. Fracasso assessed (among other things) anxiety and depression, and increased Gamble's Paxil dosage to 40 mg daily.  (*Id.*)

On May 16, 2013, Gamble underwent a Diagnostic Assessment with professional clinical counselor Adam Rebh, P.C.C., at Coleman Behavioral Health.  (Tr. 473-489.)  Gamble reported depression, which he rated an 8 on a scale of 10 "most of the time."  (Tr. 484.)  He complained of decreased motivation, increased isolation, lack of interest and enjoyment in life activities, and feelings of hopelessness, helplessness, and worthlessness.  (*Id.*)  Gamble also reported anxiety, which he rated a 6 on a scale of 10 "some of the time."  (*Id.*)  He stated his "heart gets fluttery and my speech becomes unclear."  (*Id.*)  Gamble also complained of bouts of irritability, distractibility, and inattention.  (*Id.*)  He explained: "I've been slipping. . . I've been passively suicidal . . . I'm not actively trying to hurt myself but with my behaviors and not managing my diabetes I was doing it anyways. . . depression, anxiety, both."  (Tr. 473.)

On mental status examination, Counselor Rebh noted Gamble was well groomed and

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

cooperative with "average" demeanor, eye contact, and motor activity.  (Tr. 485-486.)  Gamble's speech was clear, his thought process was logical, and his mood was euthymic/relaxed.  (Tr. 486.)  Counselor Rebh also noted a full affect, no delusions or hallucinations, and no impairment in memory, attention, or concentration.  (Tr. 486.)  He diagnosed major depressive disorder, recurrent, and assessed a GAF of 50, indicating serious symptoms.[5]  (Tr. 488.)

The record reflects Gamble returned for sessions with Counselor Rebh on thirteen occasions in 2013.  (Tr. 433-453, 541-555, 556-567.)  During these visits, Counselor Rebh consistently noted the following during mental status examination: (1) well groomed appearance, (2) average demeanor, (3) cooperative behavior, (4) average eye contact, (5) average motor activity, (6) clear speech, (7) euthymic/relaxed mood, (8) full affect, (9) logical thought process, (10) no impairment in memory, attention, and/or concentration, (11) fair insight, and (12) good judgment.  (*Id.*)

Counselor Rebh's treatment notes reveal Gamble's symptoms fluctuated somewhat over the course of the year.  In May 2013, Gamble reported he was "back on his Paxil" and "doing a little bit better," resulting in increased attention, concentration, and interest in life activities.  (Tr. 435.)  He stated he was "working diligently to resume medication compliance."  (*Id.*)  In June 2013, Gamble stated he had worked to increase his social contacts but also had "some increased symptoms as well."  (Tr. 439.)  In July, Gamble reported "he spent increased time socializing, engaging in productive and meaningful activity and how as a result of these improvements he found himself falling into a 'normal' schedule."  (Tr. 442.)  The following month, Gamble

---

[5] A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.

5

complained of increased stress due to his financial struggles.  (Tr. 449.)  By December 2013, Gamble "reported that he has continued to work to sustain medication compliance (with psych and physical health needs) and reported that in working with treating providers and in taking medications as prescribed over an extended period of time, he is beginning to 'reap the rewards,' stating that he is feeling increasingly stable in his mental and physical well-being."  (Tr. 566.)

Gamble also presented to psychiatrist Roy Vellanki, M.D., on two occasions in 2013. (Tr. 490-497, 636-640.)  On September 3, 2013, Gamble described his symptoms as follows:

> client reports depressed mood and anxiety adolescent years.  He reports medical problems and financial difficulties as being stressful to him.  He reports low self esteem feeling worthless, states he has problems with confidence.  He has poor motivation low energy level and difficulty with sleep difficulty initiating sleep. . . . Client has some periods of high anxiety with his heart racing, more perspiration states such symptoms are better in the last few months but remains with depressed mood.  Client reports fleeting suicidal thought frequently without intent to harm self.

(Tr. 490.)  On mental status examination, Dr. Vellanki noted Gamble was well groomed with average demeanor, cooperative behavior, average eye contact, average motor activity, clear speech, depressed mood, full affect, logical thought process, and fair insight and judgment.  (Tr. 493-495.)  He also found no impairment of memory, attention, and/or concentration, noting Gamble could do multiplication and division, provide the meaning of a proverb, and could recall three out of three objects after five minutes.  (Tr. 494-495.)  Dr. Vellanki diagnosed major depressive disorder, recurrent, unspecified; prescribed Celexa and Trazodone; and assessed a GAF of 50, indicating serious symptoms.  (Tr. 495-496.)

Gamble returned to Dr. Vellanki on December 5, 2013.  (Tr. 636-640.)  He indicated the medication helped but some days he "felt too drowsy."  (Tr. 636.)  On examination, Dr. Vellanki noted Gamble was casually dressed and well oriented with average demeanor/behavior, good eye

6

contact, clear speech, moderately depressed mood, full affect, logical thought process, and fair insight and judgment. (Tr. 636-637.) He also found Gamble had no abnormal thought content or issues with memory, attention, and/or concentration. (Tr. 637.) Dr. Vellanki again diagnosed major depressive disorder, recurrent, unspecified; and assessed a GAF of 50. (Tr. 638.) He increased the Celexa dosage, discontinued Trazodone, and prescribed Seroquel as needed for "insomnia or anxiety."[6] (Tr. 639.)

Gamble also presented to Dr. Fracasso on several occasions in 2013 for treatment of various health concerns including complications arising from diabetes, obesity, and depression. (Tr. 389-390, 404-405, 510-517.) On September 27, 2013, Dr. Fracasso completed a "Medical Source Statement of Ability to Do Work-Related Activities" regarding Gamble's mental impairments. (Tr. 499-501.) Dr. Fracasso opined Gamble had "marked depression and [a] disrupted sleep schedule," causing him to be (1) mildly limited in his abilities to understand, remember, and carry out simple instructions; and (2) moderately limited in his ability to made judgments on simple work-related decisions, and understand, remember, carry out and make judgments on complex work-related decisions. (Tr. 499.) Dr. Fracasso also concluded Gamble was moderately limited in his abilities to interact appropriately with the public, supervisors, and co-workers, and moderately limited in his ability to respond appropriately to usual work

---

[6] In addition to Counselor Rebh and Dr. Vellanki, Gamble also presented to qualified mental health specialist Meghan Searles on five occasions in 2013. (Tr. 424-432, 532-537.) Ms. Searles' mental status examination findings were generally similar to those recorded by Counselor Rebh and Dr. Vellanki; however, on several occasions, Ms. Searles noted Gamble was disheveled with an anxious or "confused" mood. (*Id.*) She also occasionally noted impairment in Gamble's memory, attention and/or concentration, often due to difficulties he encountered understanding and completing paperwork for benefits such as food stamps. (Tr. 428, 533, 536.)

7

situations and changes in a routine work setting.  (Tr. 500.)

In 2014, Gamble continued to present regularly to Counselor Rebh, seeing him on seventeen (17) occasions.  (Tr. 568-629.)  During these visits, Counselor Rebh again consistently noted the following during mental status examination: (1) well groomed appearance, (2) average demeanor, (3) cooperative behavior, (4) average eye contact, (5) average motor activity, (6) clear speech, (7) euthymic/relaxed mood, (8) full affect, (9) logical thought process, (10) no impairment in memory, attention, and/or concentration, (11) fair insight, and (12) good judgment.  (*Id.*)

Counselor Rebh's treatment records from 2014 continue to reflect fluctuation in Gamble's symptoms, but no serious relapses.  In January 2014, Gamble reported feelings of loneliness and agreed to "work towards increased activity and socialization."  (Tr. 570, 574.)  During these visits, he also expressed a desire to work with the Bureau of Vocational Rehabilitation ("BVR") to pursue employment opportunities.  (*Id.*)  In February 2014, Gamble reported making "some progress" in terms of socialization; however, the following month, he indicated he had "taken a step backwards," stating "he had disengaged from services with providers at [Coleman Behavioral Health], that he had ceased taking pscyh meds (which he reported doing periodically due to adverse side effects), and that he had spent increased time isolating from others/disengaging from social interactions/activities."  (Tr. 578, 582.)

In April 2014, Gamble reported poor motivation and apathy as his "primary barriers." (Tr. 588.)  Later that month, he reported having a "positive couple of weeks" and stated "I've been getting stuff done."  (Tr. 591.)  In May, Gamble stated "I have made some progress, and I wanna make some more."  (Tr. 592-593.)  The following month, Gamble reported improved self-

8

esteem and decreased symptoms when engaged in activities.  (Tr. 597.)  In July 2014, Gamble "reported on overall satisfaction with growth and developments since last counseling appointment, stating that he has worked to increase his socialization as well as physical activity." (Tr. 601.)  In September, Gamble reported feeling overwhelmed "due to overcomplicating things which prevents him from moving forward."  (Tr. 612.)  He complained of "poor motivation" and "ambivalence" during the last several months of 2014.  (Tr. 616, 620, 624, 628.)  In November 2014, however, Gamble indicated "this is the happiest I've been in awhile."  (Tr. 624.)

Meanwhile, Gamble continued to regularly present to Dr. Vellanki.  On March 18, 2014, Gamble complained of "problems with irritability and depression."  (Tr. 641.)  Gamble stated medication had "helped" but he had stopped taking it due to side effects, including drowsiness. (*Id*.)  He reported "problems with motivation [and] energy level," and indicated he was "unlikely to be able to tolerate [a] full time job now with respect to stamina and mental health problems." (*Id*.)  On examination, Dr. Vellanki noted Gamble was casually dressed and well oriented with average demeanor/behavior, good eye contact, clear speech, full affect, logical thought process, and fair insight and judgment.  (Tr. 641-642.)  He described Gamble's mood as "mildly depressed and irritable, some anxiety," but found Gamble had no abnormal thought content or issues with memory, attention, and/or concentration.  (Tr. 642.)  Dr. Vellanki again diagnosed major depressive disorder, recurrent, unspecified; and assessed a GAF of 50.  (Tr. 643.)  In describing Gamble's progress, Dr. Vellanki noted:  "still with poor motivation [and] some irritability."  (Tr. 644.)  He advised Gamble to continue taking Celexa.[7]  (*Id*.)

---

[7] On March 20, 2014, Dr. Fracasso noted Gamble had "actually stopped taking the Celexa" and "was off this for about 2 months but within the last week has restarted." (Tr. 518.)

On April 17, 2014, Dr. Vellanki completed a Mental Impairment Questionnaire regarding Gamble's mental health symptoms and limitations.  (Tr. 503-508).  Dr. Vellanki indicated he had started treating Gamble in May 2013; identified a diagnosis of Major Depressive Disorder, Recurrent, Unspecified; and assessed a GAF of 50.  (Tr. 503.)  Dr. Vellanki identified Gamble's symptoms as (1) decreased energy; (2) feelings of guilt or worthlessness; (3) mood disturbance; (4) difficulty thinking or concentrating; (5) emotional withdrawal or isolation; (6) easy distractibility; (7) memory impairment; and (8) sleep disturbance.  (Tr. 504.)  He noted, however, that Gamble "reports increased effects/effectiveness in attending to health issues which has reportedly facilitated him in experiencing decreased health concerns and slight increase in functioning."  (Tr. 503.)

In terms of Gamble's functional limitations, Dr. Vellanki opined Gamble was "seriously limited"[8] in his abilities to (1) sustain an ordinary routine without special supervision; (2) perform at a consistent pace without an unreasonable number and length of rest periods; and (3) carry out detailed instructions.  (Tr. 505-506)  He concluded Gamble's abilities in the following categories fell between "limited but satisfactory" and "seriously limited:" (1) complete a normal workday and workweek without interruptions from psychologically based symptoms; (2) deal with normal work stress; (3) understand and remember detailed instructions; (4) set realistic goals or make plans independently of others; (5) deal with stress of semiskilled and skilled work; and (6) adhere to basic standards of neatness and cleanliness.  (*Id.*)  Dr. Vellanki found Gamble

---

[8] The form completed by Dr. Vellanki defines the term "seriously limited" as meaning "your patient has noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the workday or workweek."  (Tr. 505.)  The term "limited but satisfactory" is defined as "your patient has noticeable difficulty (e.g., distracted from job activity) no more than 10 percent of the workday or workweek." (*Id.*)

10

was "limited but satisfactory" in his abilities to (1) remember work like procedures; (2) maintain attention for two hour segments; (3) maintain regular attendance and be punctual within customary, usually strict tolerances; (4) accept instructions and respond appropriately to criticism from supervisors; (5) respond appropriately to changes in a routine work setting; and (6) interact appropriately with the general public.  (*Id.*)  Finally, Dr. Vellanki opined Gamble had "no useful ability" to use public transportation, and would be absent about one day per month due to his impairments or treatment.  (Tr. 506, 508.)

With regard to the four broad functional areas, Dr. Vellanki concluded Gamble was (1) mildly limited in his activities of daily living; (2) moderately limited in maintaining social functioning; (3) moderately limited in maintaining concentration, persistence, or pace; and (4) likely to experience one to three episodes of decompensation within a 12 month period, each of at least two weeks duration.  (Tr. 507.)  Dr. Vellanki noted Gamble had difficulty with concentration and attention, and appears to have assessed his prognosis as "fair."  (Tr. 503.)

Gamble returned to Dr. Vellanki on June 24, 2014.  (Tr. 646-655.)  He again reported problems with irritability and depression, and complained of poor motivation and frustration.  (Tr. 646.)  Dr. Vellanki's mental status examination findings were the same as during Gamble's March 2014 visit, including findings of mildly depressed and irritable mood with some anxiety.  (Tr. 647.)  Dr. Vellanki continued to assess Major Depressive Disorder, Recurrent, Unspecified; and a GAF of 50.  (Tr. 648.)  He continued Gamble on his medication.  (*Id.*)

On September 26, 2014, Gamble reported his depression and irritability were "better than in the past" but indicated he "still has some problems with low energy level."  (Tr. 651.)  Dr. Vellanki's mental status examination findings, diagnosis, and GAF assessment remained

11

consistent with Gamble's previous visits.   (Tr. 651-652.)  In describing Gamble's progress, however, Dr. Vellanki noted Gamble's mood was "less depressed and less irritable," though he still had poor motivation and "some anxiety."  (Tr. 654.)

On December 19, 2014, Gamble reported he was depressed because of "medical problems and finances," but continued to indicate it was "better than in the past."  (Tr. 669.) Mental status examination findings were normal, aside from depressed mood and fair insight and judgment.  (Tr. 669-670.)  Dr. Vellanki again diagnosed Major Depressive Disorder, Recurrent, Unspecified; assessed a GAF of 50; and continued Gamble on his medication.  (Tr. 671-672.)

Dr. Vellanki thereafter issued two opinions regarding Gamble's mental functioning, on January 8, 2015 and January 28, 2015.  In the January 8, 2015 opinion (entitled "Mental Impairment Questionnaire"), Dr. Vellanki offered a diagnosis of Major Depressive Disorder, Recurrent, Unspecified, assessed a GAF of 50, and identified the same mental health symptoms as set forth in his April 2014 opinion.  (Tr. 657-658.)  Dr. Vellanki identified the same areas of "serious limitation" as in the April 2014 opinion, and further found Gamble was "seriously limited" in his abilities to (1) complete a normal workday and work week without interruptions from psychologically based symptoms, and (2) adhere to basic standards of neatness and cleanliness.  (Tr. 659-660.)  Additionally, Dr. Vellanki found Gamble would be absent from work about three days per month as a result of his impairments or treatment (as opposed to one day per month, as found in the April 2014 opinion).  (Tr. 662.)

With regard to the four broad functional areas, Dr. Vellanki concluded Gamble was (1) mildly limited in his activities of daily living; (2) moderately limited in maintaining social functioning; (3) markedly limited in maintaining concentration, persistence, or pace; and (4)

12

likely to experience one to three episodes of decompensation within a 12 month period, each of

at least two weeks duration.  (Tr. 661.)  Dr. Vellanki noted Gamble had difficulty with

concentration and attention, and assessed his prognosis as "poor."  (Tr. 657.)

Several weeks later, on January 28, 2015, Dr. Vellanki completed another opinion,

entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)."  (Tr.

665-667.)  In this opinion, Dr. Vellanki opined Gamble had no limitations in his abilities to

understand, remember, and carry out simple instructions, and was mildly limited in his ability to

make judgments on simple work-related decisions.  (Tr. 665.)  He further concluded Gamble's

limitations as to his ability to understand, remember, and carry out complex instructions and

make judgments on complex decisions, fell between moderate and marked.[9]  (*Id*.)  Lastly, Dr.

Vellanki found Gamble had no limitations in his abilities to interact appropriately with the public

and co-workers; a mild limitation in his ability to interact appropriately with supervisors; and a

mild to moderate limitation in his ability to respond appropriately to usual work situations and to

changes in a routine work setting.  (Tr. 666.)

The record reflects Gamble presented to Counselor Rebh on ten (10) occasions between

January and June 2015.  (Tr. 679-702, 716-731.)  During these visits, Counselor Rebh again

noted the following during mental status examination: (1) well groomed appearance, (2) average

demeanor, (3) cooperative behavior, (4) average eye contact, (5) average motor activity, (6) clear

---

[9] The form completed by Dr. Vellanki on January 28, 2015 is different from (and less
extensive than) the forms used in connection with his previous opinions dated April 14,
2014 and January 8, 2015.  In the January 28, 2015 form, the term "moderate" is defined
as "more than a slight limitation in this area but the individual is still able to function
satisfactorily."  (Tr. 665.)  The term "marked" is defined as follows: "There is serious
limitation in this area.  There is a substantial loss in the ability to effectively function."
(*Id*.)

13

speech, (7) euthymic/relaxed mood, (8) full affect, (9) logical thought process, (10) no impairment in memory, attention, and/or concentration, (11) fair insight, and (12) good judgment. (*Id*.)

While Gamble reported some fluctuation in his mental health symptoms, the record reflects overall improvement during the first half of 2015. In January 2015, Gamble reported "reaching a 'plateau,'" and "reviewed [his] intentions to sustain this growth and reviewed his continued commitment to medication compliance." (Tr. 681.) In February, he reported working on DJ gigs with a friend, and recounted his plans for a birthday celebration with his parents. (Tr. 693.) While he complained of a "decline in energy and motivation" in March 2015 (Tr. 697), he reported "doing well" the following month after spending time with his family in Florida. (Tr. 718.) In May 2015, Gamble indicated he was eating healthier, was exercising regularly, and had joined a gym. (Tr. 720.) He stated he was doing "much better," specifically "in regards to increased activity/exercising and improved diet/nutrition." (Tr. 722.) Later that month, he "reported on positive steps taken, particularly as of late in regards to exercising and working to improve diet [as well as] overall growth associated with self-care skills, med compliance, ability to attend to personal well-being and interpersonal relationships."[10] (Tr. 726.) In June 2015, Gamble "reported on ability to sustain healthier eating habits and exercise program, reviewing how he is excited about his progress in this area." (Tr. 730.) He also described his "overall ability to manage health concerns and interpersonal functioning, noting that he recently went on

---

[10] Also in May 2015, Gamble returned to Dr. Fracasso for follow up regarding his diabetes mellitus and the results of a recent sleep study. (Tr. 741-749.) Gamble underwent a Depression Screening at this appointment, which was interpreted as showing "moderately severe depression." (Tr. 741.)

a date."  (*Id.*)

Meanwhile, Gamble returned to Dr. Vellanki on March 13, 2015.  (Tr. 674-678.) Gamble reported feeling tired and depressed.  (Tr. 674.)   On examination, Dr. Vellanki noted Gamble was casually dressed and well oriented with average demeanor/behavior, good eye contact, clear speech, full affect, logical thought process, depressed mood, and fair insight and judgment.  (Tr. 675.)  He found Gamble had no abnormal thought content or issues with memory, attention, and/or concentration.  (*Id.*)  Dr. Vellanki again diagnosed major depressive disorder, recurrent, unspecified; and assessed a GAF of 50.  (Tr. 676.)  In describing Gamble's progress, Dr. Vellanki noted:  "still with poor motivation sleeping excessively."  (Tr. 677.)  He changed Gamble's medications, discontinuing the Celexa and starting Effexor.  (*Id.*)

On June 11, 2015, Gamble reported he was not sleeping as excessively and stated he was trying to exercise and lose weight.  (Tr. 732.)  Mental status examination findings were consistent with his previous visit, with the exception that Dr. Vellanki noted some impairment in attention and concentration.  (Tr. 733.)  Dr. Vellanki noted "some improvement in motivation" and increased Gamble's Effexor dosage.  (Tr. 736.)

**C.      Relevant State Agency Reports**

On June 12, 2013, Gamble underwent a consultative examination with state agency neuropsychologist James M. Lyall, Ph.D.  (Tr. 417-421.)  Gamble reported he had been depressed, "on and off," throughout most of his life.  (Tr. 417.)  He indicated he had received mental health care "going back to his childhood when had some depression and behavioral problems."  (Tr. 418.)  Gamble reported sleep problems, indicating "his mind races at times and it keeps him awake."  (Tr. 419.)  He denied crying spells, but admitted to some thoughts of

suicide without plan or intention.  (*Id.*)  Gamble also admitted to feelings of hopelessness and worthlessness and described his energy level as "mostly down."  (*Id.*)

Gamble stated he was currently receiving mental health treatment and had been prescribed Paxil.  (Tr. 418.)  He reported his anxiety symptoms had improved since taking medication.  (Tr. 419.)  He described a "somewhat inactive lifestyle," but indicated he did some of the household chores and enjoyed writing short stories for family members.  (Tr. 418.)  Gamble stated he did not socialize much but "can generally get along with people."  (*Id.*)

On examination, Gamble was cooperative and oriented to place and situation.  (Tr. 418-419.)  Dr. Lyall found Gamble spoke in a "relevant and coherent fashion," had good vocabulary, expressed himself well, and had no difficulty understanding examination questions.  (Tr. 419.)  Gamble could remember three of three objects immediately and three of three objects after five minutes, and was able to repeat a full six numbers forward and five numbers backward.  (*Id.*)  Dr. Lyall estimated Gamble's intellectual skills "at least within the high average range."  (*Id.*)  He also found Gamble had "some insight" into his need for mental health care, and "appears to have a history of adequate judgment with adequate work experience."  (*Id.*)

Dr. Lyall diagnosed depressive disorder, not otherwise specified; and assessed a Symptom Global Assessment of Functioning ("GAF") of 55, a Functional GAF of 70, and an Overall GAF of 55, indicating moderate symptoms.  (*Id.*)  In terms of four broad functional areas, Dr. Lyall did not offer any specific restrictions but concluded as follows:

> **Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**
> Chad graduated from high school and a four year college program. His general intelligence may be within the upper end of the average range. He could remember three of three objects after five minutes and had no difficulty with a simple common proverb.

16

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**
Chad could repeat six numbers forward and five numbers backward. He states he can generally focus on what people tell him to do. He does simple household chores at home but hasn't been keeping up with his dental hygiene.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**
The claimant states he can get along with people adequately and he doesn't socialize much anymore because he doesn't have the financial resources. He was pleasant and cooperative with this examiner.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**
Chad indicates he is unable to work because of his depression and cellulitis. It is expected if he was able to physically work that he would be able to handle work pressure about as well as he did in the past which appeared to be adequate.

(Tr. 420-421.)  Lastly, Dr. Lyall concluded Gamble's "depressive symptoms may improve if he remains in mental health care or if his life situation improves."  (Tr. 419-420.)

On June 21, 2013, state agency psychologist Katherine Fernandez, Psy.D., reviewed Gamble's medical records and completed a Psychiatric Review Technique ("PRT") regarding Gamble's mental impairments.  (Tr. 69.)  She found Gamble had mild limitations in his activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of decompensation of extended duration.  (*Id.*)  Dr. Fernandez found Gamble's mental impairments were "not significantly affecting his functioning and are not severe."  (*Id.*)  She explained her reasoning as follows:

42 year old male completed 12th grade education and has a BA in English. General intelligence estimated in the high average range.  Good relationships with family and friends.  Doesn't socialize much due to lack of financial resources. Pleasant and cooperative with CE examiner [Dr. Lyall].  Able to recall 6 forward and 5 reverse, remember 3/3 objects after five minutes.  Able to adequately

17

handle work stress, when he is working.

(*Id.*)

On October 3, 2013, state agency psychologist Deryck Richardson, Ph.D., reviewed Gamble's medical records and completed a PRT.  (Tr. 81-82.)  Dr. Richardson reached the same conclusions as Dr. Fernandez.  (*Id.*)

**D.     Hearing Testimony**

**1.          February 2015 Hearing**

During the February 11, 2015 hearing, Gamble testified to the following:

- He graduated from University of Akron in 1998 with a bachelor's degree in English.  (Tr. 764.)

- He has worked at a number of pizza restaurants over the years, as a delivery driver, assistant manager, and manager.  (Tr. 766-770.)  As a delivery driver, he was on his feet a good deal of the day and lifted up to 30 pounds.  (Tr. 769.)  In his managerial positions, he was on his feet for about 5 ½ hours per day and sat for about 2 to 2 ½ hours per day.  (Tr. 768.)  He lifted between 80 and 100 pounds.  (*Id.*)

- He has engaged in some work post-dating his onset date by occasionally assisting his friend who is a DJ.  (Tr. 764.)  Specifically, he has driven his friend to his DJ gigs and helped with set up, including connecting wires.  (*Id.*)  On average, he assists his DJ friend once per month.  (*Id.*)

- He suffers from a number of physical health problems, including diabetes, lower back pain, and tendinitis in his right elbow.  (Tr. 771-775, 780.)  His diabetes has caused chronic bacterial infections and neuropathy in his feet and hands.  (Tr. 771-772.)  He has suffered from cellulitis on numerous occasions, and has been on preventative antibiotics for the past eight months.  (Tr. 773.)  Despite that, he has had seven abscesses in the last eight months, each of which lasted five to six days and were very painful.  (*Id.*)  He experiences neuropathy in his hands daily, which is brought on by repetitive motion and generally lasts for three to four hours.  (Tr. 782-783.)  Due to his tendonitis, he has had right elbow pain lasting six to eight weeks, on three separate occasions in the last nine months. (Tr. 773-774.)  He suffers lower back pain because of his weight.  (Tr. 780.)  At the time of he hearing, he was 6' 5" and weighed 400 pounds.  (Tr. 763.)

18

- He is taking Metformin, Amaryl, NovoLog, and Lantus for his diabetes.  (Tr. 772.)  His diabetes is better controlled than it used to be, but his blood sugar levels are still high and typically range between 180 and 270.  (Tr. 772, 786.)  He always takes his diabetes medications, but does not always check his blood sugar levels as directed.  (Tr. 785.)

- He also suffers from depression and anxiety.  (Tr. 775.)  There are some days when he has trouble doing anything, such as getting out of bed, bathing, preparing meals, etc.  (*Id*.)  On a "bad day," he has trouble getting out of bed in the morning.  (Tr. 787.)  He has two to three bad days per week.  (*Id*.)  He tries to be gregarious, but he is a "very solitary person."  (Tr. 776-777.)  He has three roommates but he barely sees them because he spends most of his time in his room.  (*Id*.)  Sometimes he has arguments or altercations with people, but he has gotten better at controlling his temper.  (Tr. 776, 783.)

- His anxiety symptoms include excessive worrying and panic attacks.  (Tr. 775-776.)  He has had four or five "really bad" panic attacks, during which he becomes tachychardic and worries he's having a heart attack.  (Tr. 776.)  He has had panic attacks in public.  (Tr. 783-784.)  When that happens, he generally has to remove himself from the situation.  (*Id*.)  He explained that "[i]f I've had [a panic attack], I'm done for the day."  (*Id*.)

- He sees a psychiatrist every three months, and visits a mental health counselor every two to three weeks.  (Tr. 779.)  He takes an anti-depressant which makes him feel more even keeled and less angry.  (Tr. 784-785.)  However, it also has a "zombie effect."  (*Id*.)  Over the last two years, his mental health symptoms have gotten "somewhat better" because he has been taking his medication and going to counseling.  (Tr. 778.)

- He likes to read, play computer games, and watch movies and TV shows.  (Tr. 776.)  He has some problems with concentration, as evidence by the fact he needs to switch back and forth between different activities.  (Tr. 777.)  He spends most of his time in his room. (Tr. 780.)  In terms of household chores, he cleans up after himself, takes his trash to the dumpster, and goes grocery shopping.  (Tr. 781.)  He can do most chores "in short bursts" and with breaks.  (*Id*.)

The VE testified Gamble had past work as a manager (light, semi-skilled, SVP 5); bar manager (light, skilled, SVP 6); and pizza delivery driver (medium, semi-skilled, SVP 3).  (Tr. 789-790.)  The ALJ then posed the following hypothetical question:

19

> I'd like for you to assume an individual the claimant's age, education, and work
> experience with the following limitations.  Occasionally lift and carry 20 pounds.
> Frequently lift and carry 10 pounds.  Stand or walk six hours, sit six hours in an
> eight hour workday with normal breaks.  Push or pull consistent with the lifting
> limitations.  Never climb ladders or scaffolds.  Occasionally climb ramps or
> stairs.  Occasionally stoop, kneel, crouch, or crawl.  The individual should avoid
> exposure to extreme heat and should avoid exposure to extreme wetness or
> humidity.  Could that individual perform any of the claimant's past work?

(Tr. 790.)

The VE testified the hypothetical individual would be able to perform Gamble's past work as a manager and bar manager, but would not be able to perform his past work as a pizza delivery driver.  (Tr. 790-791.)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as marker (light, unskilled, SVP 2); housekeeping cleaner (light, unskilled, SVP 2); and cashier II (light, unskilled, SVP 2). (Tr. 791-792.)

The ALJ then asked a second hypothetical that was the same as the first, but added the following limitations:

> The individual would [also] be limited to simple, routine, and repetitive tasks.
> Would be limited to work involving only occasional decision making, occasional
> changes in the work setting, and no strict quota requirements.  Would be able to
> occasionally interact with the public, co-workers, and supervisors.

(Tr. 792.)  The VE testified the hypothetical individual would not be able to perform any of Gamble's past work, or the cashier II position.  (*Id.*)  The VE testified, however, that Gamble would be able to perform the previously identified jobs of marker and housekeeping cleaner, as well as the job of hand packer (light, unskilled, SVP 2).  (Tr. 792-793.)

The ALJ then asked the VE to assume the first two hypotheticals with the additional limitation that the individual would be restricted to occasional use of the right lower extremity

20

for operation of foot controls. (Tr. 793.)  The VE testified the hypothetical individual would be able to perform the previously identified jobs of marker, housekeeping cleaner, and hand packer. (*Id.*)

> The ALJ then posed the following hypothetical:
>
> So for purposes of the third hypothetical the individual would be limited to standing or walking about two hours, sitting six hours in an eight hour workday with normal breaks.  The individual can occasionally climb stairs but only climb – strike that.  Occasionally climb ramps but can only climb stairs less than two hours in an eight hour workday.  We will include the limitation on occasional operation of the right lower extremity for operation of foot controls.  And all of the other limitations in the second hypothetical remain the same.  Would that individual be limited to sedentary work?

(Tr. 794.)  The VE testified the hypothetical individual would be limited to sedentary work, and could perform the following representative jobs: document preparer (sedentary, unskilled, SVP 2); sorting or inspecting position (sedentary, unskilled, SVP 2); and addresser (sedentary, unskilled, SVP 2).  (Tr. 795.)

The ALJ then asked the VE to assume an individual that would be off task up to 20% of the workday or workweek due to problems sustaining an ordinary routine without special supervision, due to difficulties performing at a consistent pace without an unreasonable number and length of rest periods, problems dealing with normal work stresses, problems completing a workday and workweek without interruptions from psychologically based symptoms and problems dealing with normal work stresses.  (Tr. 795-796.)  The VE testified an individual distracted from job activity and off task approximately 20% of the workday would not be able to sustain gainful employment.  (Tr. 796.)

Gamble's attorney then asked the VE whether "it would be correct to say that the limitation to simple, routine, and repetitive tasks would preclude the ability to carry out detailed

21

written and oral instructions." (Tr. 797.) The VE responded that it would. (Tr. 798.) Finally,

Gamble's attorney asked the VE: "If a hypothetical individual were to be absent two or more

days a month, would that preclude all of the available jobs?" (Tr. 799.) The VE testified that

two or more absences per month in unskilled occupations would be "job prohibitive." (Tr. 799-

800.)

### 2.    June 2015 Hearing

During the June 12, 2015 hearing, Gamble testified to the following:

- Since the last hearing, the neuropathy in his feet and hands had gotten worse. (Tr. 47.)  The numbness in his fingers, in particular, had worsened and was "pretty much always present." (Tr. 48.)  As a result, he has trouble with fine motor skills, such as buttoning shirts, tying shoes, etc. (Tr. 47.)

- He can lift 30 pounds from the floor, and 40 pounds from a table. (Tr. 47.)  He has no limitations with sitting, but has some problems with standing and walking. (*Id.*)

- His mental condition is "fairly the same." (Tr. 47.)  His psychiatrist changed his anti-depressant to Effexor and doubled the dosage. (Tr. 49-50.)  He has been making more of an active effort to improve his physical and mental health by exercising, eating better, and paying more attention to his thoughts and feelings. (Tr. 47.)  He tries to leave the house every day. (Tr. 49.)

- He has a terrible time falling asleep, and wakes frequently. (Tr. 50.)  He had a sleep study which showed his pulse oxygen levels dropped to 84 to 85% during the night. (*Id.*)  He was scheduled to undergo another sleep study, this time with a CPAP. (*Id.*)

- On a typical day, he wakes up, has a protein shake, takes a shower, and goes to the park or recreation center to get some exercise. (Tr. 49.)  He spends the rest of the day on the computer, watching TV, or doing chores. (*Id.*)

Medical Expert Jeffrey Andert, M.D., also testified at Gamble's hearing. (Tr. 39-45.)

Dr. Andert first testified "the record would support the presence of an affective disorder,

specifically a major depressive disorder recurrent to a moderate degree of severity." (Tr. 39.)

22

He acknowledged "there is reference in the record to some anxiety related symptoms" and "in fact earlier there was an assigned diagnosis of an anxiety related disorder."  (Tr. 39-40.)  However, he stated "I don't find documentation of a separate anxiety related disorder during that time period that we're considering at this time," i.e., May 8, 2013 to the date of the hearing.  (*Id.*)

Dr. Andert testified Gamble's impairments, singly or in combination, did not meet or equal any of the listings.  (Tr. 40.)  As for Gamble's functional limitations, Dr. Andert opined as follows:

> The claimant would be limited in my opinion to one to three step tasks.  I don't believe he'd be able to perform detailed or complex tasks or make decisions about those on a routine basis.  He would require a low stress environment that did not have high productivity or quota requirements.  In think there would be essentially an ability to function in the social realm with only mild restriction in that particular area, to make – it would be more of an occasional with regard to his contact with co-workers, supervisors, and the general public.  I would think probably he's able to function in the 80 percent range with regard to those three groups of social contacts or interactions.  Those would be the limitations that I think would stem from his affective symptoms.

(Tr. 40-41.)  In response to further questioning from the ALJ, Dr. Andert stated Gamble was mildly limited in his activities of daily living and social functioning.  (Tr. 41-42.)  He further found Gamble's limitations in the area of concentration, persistence, and pace were more than mild but less than marked.  (Tr. 41.)  Dr. Andert did not see any episodes of decompensation of extended duration in Gamble's medical record.  (*Id.*)

Dr. Andert also testified regarding his assessment of the medical opinions submitted by Dr. Vellanki.  (Tr. 42-44.)  Specifically, Dr. Andert testified as follows:

> Q:      Do you generally agree with [Dr. Vallanki's] assessments or do you feel that the claimant is less limited? It sounds like you're saying that you feel the claimant is less limited than indicated by Dr . Valanki [sic].

23

A:      I guess in terms of his opinions with regard to the RFC or ratings.  He
        provided on the B criteria, for example, Exhibit 9F page six.  I think
        those are relatively consistent other than the fact that I didn't find any
        episodes of deterioration or decompensation.  I think that they're
        relatively similar in terms of [INAUDIBLE] also preclude work with
        regard to complex or detailed tasks.  The medical record that's described
        in terms of the treatment that was provided I don't think documented any
        more severe impairments than I indicated. Severe functional limitations I
        should say.

Q:      Dr. Valanki [sic] indicated at one point that he felt the claimant due to his
        impairments would need to be absent about one day per month.  I think at
        another time he indicated that the claimant would need to be absent from
        work about three days per month on average as a result of his
        impairments. Would you agree with either of those assessments?

A:      Provided the claimant is compliant with the treatment protocol the nature
        of his impairment is not episodic and I didn't find any pattern of behavior
        that would suggest or predict any greater frequency than perhaps once per
        month that his ability to attend work would be precluded based on his
        affective symptoms alone.

* * *

By Gamble's counsel:

Q:       Now when you said you were describing Dr. Valanki' s [sic] assessments
        you specifically stated 9F.  And in that it said that he would be seriously
        limited in performance of constant pace.  But then your RFC differed
        even though you just said that you agreed with basically what he said.  I
        was wondering if you could explain how that is differing for you.

A:      There are a couple of exhibits in the record from Dr. Valanki. Exhibit
        14F I think is quite consistent with the opinion that I indicated.  Let me
        get back to 9F here. There's functional limitations that are described in
        Exhibit 9F that are somewhat different than what we discussed and what
        the judge asked me. The specific issue is I think my opinion with regard
        to pace would be included in the opinion that I provided.  With regard to
        the affective disorder I didn't find evidence of it.  He would be seriously
        limited with regard to pace.  There would be limitations but I believe
        they'd more in the -- in the moderate range. So that would be a difference
        [INAUDIBLE] that I think--  go ahead.

Q:      Now as far as in 12F the doctor had listed some symptoms.  Did you

24

           review 12F page three?

A:      Yes.

Q:      Do you agree with those symptoms that he had listed as symptoms that the claimant suffers from today?

A:      I think a number of those were described in the record in terms of the ongoing progress notes with regard to his mental health treatment, particularly depressive symptoms such as the decreased energy, feelings of worthlessness , mood disturbance, some difficulty concentrating or thinking, emotional withdrawal.  I think some distractibility.  I didn't find any measures of memory impairment in terms of objective assessment of that beyond what might be a function of concentration difficulties.  And there was reference to sleep disturbance in the record as well.  Pursues ongoing treatment.

(Tr. 42-45.)

Lastly, a VE testified at Gamble's hearing.  The ALJ first asked the VE the following hypothetical question:

I'd like for you to assume an individual of the claimant's age, education, and work experience with the following limitations.  Occasionally lift and carry 20 pounds.  Frequently lift and carry 10 pounds. Stand or walk six hours, sit six hours in an eight hour workday with normal breaks.  Give me just a minute. Never climb ladders or scaffolds.  Occasionally climb ramps or stairs. Occasionally stoop, kneel, crouch, or crawl.  Frequently handle and finger objects.  The individual should avoid exposure to extreme heat, wetness, or humidity.  The individual would be limited to simple, routine, and repetitive tasks consistent with unskilled work but no more than three steps.  The individual is limited to low stress work which I'll define as involving no strict quota requirements, occasional decision making, and occasional changes in the work setting.  And the individual can frequently interact with the public, co-workers, and supervisors.  Would that individual be capable of performing any of the claimant's past work?

(Tr. 53-54.)  The VE testified the hypothetical individual would not be able to perform any of

Gamble's past work but would be able to perform other representative jobs such as housekeeping

cleaner (light, unskilled, SVP 2); cashier II (light, unskilled, SVP 2); and automatic car wash

25

attendant (light, unskilled, SVP 2). (Tr. 54-55.)

The ALJ then asked the VE to consider the same hypothetical with the additional limitation that "the individual would require no more than one unscheduled absence per month." (Tr. 55.) The VE testified such an individual would be able to perform the previously identified jobs of housekeeping cleaner, cashier II, and automatic car wash attendant. (*Id.*)

Gamble's attorney then asked: "If we took the first hypothetical and then added to it that as a result of decreased energy, mood disturbance, difficulty concentration, things of that nature they would be off task 20% of the workday would there be any jobs?" (Tr. 55-56.) The VE testified there would not. (Tr. 56.) The VE also testified there would be no jobs for a hypothetical individual with three absences per month. (Tr. 57.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923

26

(6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Gamble was insured on his alleged disability onset date, May 8, 2013, and remained insured through June 30, 2017, his date last insured ("DLI.")  (Tr. 14-15.)  Therefore, in order to be entitled to POD and DIB, Gamble must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2017.

2.      The claimant has not engaged in substantial gainful activity since August 12, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*)

3.      The claimant has the following severe combination of impairments: diabetes mellitus, with recurrent abscesses and cellulitis; obesity with hypoventilation syndrome during sleep; right elbow tendinitis; and a major depressive disorder (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant: can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can stand and/or walk six hours and sit six hours in an eight-hour workday; should never climb ladders or scaffolds; can occasionally climb ramps or stairs; can occasionally stoop, kneel, crouch, or crawl; can frequently handle and finger objects; is limited to simple, routine, and repetitive tasks of up to three steps; needs a work environment involving only occasional decision making, occasional changes in the work setting, and no strict quota requirements; and can have frequent interaction with the public, co-workers, and supervisors.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on February *** 1971, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

28

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 12, 2012 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-27.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial

29

evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

30

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.

Ohio July 9, 2010).

## VI.  ANALYSIS

### *Treating Physician Dr. Vellanki*

In his first assignment of error, Gamble argues remand is required because "the ALJ

failed to mention, consider, or even acknowledge" Dr. Vallenki's second medical opinion

regarding Gamble's mental functioning; i.e. the January 8, 2015 opinion.  (Doc. No. 14 at 7.)

Gamble asserts "the unacknowledged medical source statement provided both support and

consistency with Dr. Vallenki's prior opinions, and further bolsters the overall reliability of Dr.

Vallenki's findings."  (*Id*.)  By failing to acknowledge or address this opinion, Gamble argues

the ALJ violated the "treating physician rule" because he failed to articulate good reasons for

rejecting Dr. Vallenki's January 8, 2015 assessment of Gamble's severe functional limitations.

(*Id*. at 11.)  Lastly, Gamble asserts the ALJ's failure to address this opinion was not harmless

because "the neglected evaluation provided consistency and additional support for Dr. Vallenki's

opinions."  (*Id*. at 12.)

The Commissioner argues the ALJ did, in fact, address Dr. Vallenki's January 8, 2015

opinion in the context of discussing Dr. Andert's medical expert testimony.  (Doc. No. 17 at 9-

10.)  In this regard, the Commissioner asserts the ALJ specifically rejected the restrictions set

forth by Dr. Vallenki in his January 8th opinion, including his opinions that Gamble would have

three absences per month, and between one and three episodes of decompensation within a 12

month period.  (*Id*. at 10.)  She maintains that "in giving Dr. Andert substantial weight, the ALJ

adopted Dr. Andert's critique of the signs and symptoms listed in Dr. Vellanki's January 8, 2015

31

opinion." (*Id*. at 12.) Thus, the Commissioner argues the ALJ acknowledged Dr. Vellanki's January 8, 2015 opinion and articulated good reasons for discounting it. (*Id*. at 13.) In the alternative, the Commissioner argues any failure to sufficiently address Dr. Vellanki's opinion was harmless because the ALJ implicitly provided sufficient reasons for rejecting the January 8, 2015 opinion. (*Id*. at 14-15.)

In his Reply Brief, Gamble argues "the Commissioner tries to connect the dots by claiming that because the ALJ considered Dr. Andert's testimony, and because Dr. Andert considered Dr. Vellanki's second medical source statement, that somehow the ALJ also considered Dr. Vellanki's second medical source statement." (Doc. No. 18 at 2.) He asserts the Commissioner's logic is "extremely flawed," and argues that Dr. Andert's testimony does not relieve the ALJ of his duty to consider Dr. Vallenki's January 8, 2015 opinion. (*Id*. at 3.) Gamble maintains this opinion "provides both support and consistency to Dr. Vallenki's findings" and asserts that "had the ALJ been aware of the second medical source statement he may have found Dr. Andert's testimony inconsistent." (*Id*.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[11] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,'

---

[11] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[12]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore

---

[12] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

In some circumstances, however, a violation of the "good reasons" rule may be considered "harmless error."  The Sixth Circuit has found these circumstances present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation."  *Wilson*, 378 F.3d at 547.  *See also Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 470–471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 Fed. Appx. 456, 464 (6th Cir. 2005).  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson*, 195 Fed. Appx. at 470–471 (6th Cir. 2006); *Hall*, 148 Fed. Appx. at 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir.

2010).  In other words, "[i]f the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."  *Friend*, 375 Fed. Appx. at 551.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ found, at step two, that Gamble suffered from the severe mental impairment of major depressive disorder.  (Tr. 17.)  After determining Gamble's impairments did not meet or equal the requirements of a listing at step three, the ALJ went on at step four to discuss the medical evidence regarding Gamble's mental health symptoms and treatment.  (Tr.

17-20, 22-24.)  The ALJ then evaluated the opinion evidence, according "substantial weight" to

Dr. Lyall's June 2013 opinion, "moderate weight" to Dr. Fracasso's September 2013 opinion,

and "little weight" to the opinions of Drs. Fernandez and Richardson.  (Tr. 23-25.)  The ALJ

discussed Dr.  Vellanki's opinions as follows:

> Another treating physician, Roy Vellanki, M.D., submitted two medical source
> statements on the claimant's behalf.  The first statement dated April 17, 2014,
> indicates the claimant began receiving mental health services in May 2013 with
> counseling approximately every two weeks and psychiatric services on a quarterly
> basis (Exhibit 9F). He diagnosed the claimant with a major depressive disorder
> that is recurrent with severity unspecified.  He assigned the claimant a Global
> Assessment of Functioning score of 50, which is indicative of serious to nearly
> moderate mental symptoms.  The claimant takes Celexa for his depression, with
> no reported side effects.  Dr. Vellanki noted the claimant had difficult with
> concentration and attention, as well as a depressed mood.  He opined that the
> claimant has unlimited to "limited but satisfactory" abilities and aptitudes in the
> following areas:  remembering work-like procedures ; understanding,
> remembering, and carrying out very short and simple instructions; maintaining
> attention for two-hour segments; maintaining regular attendance and being
> punctual within customary, usually strict tolerances; working in coordination with
> or proximity to others without being unduly distracted; making simple,
> work-related decisions; asking simple questions or requesting assistance;
> accepting instructions and responding appropriately to criticism from supervisors;
> getting along with co-workers or peers without unduly distracting them or
> exhibiting behavioral extremes; responding appropriately to changes in a routine
> work setting; being aware of normal hazards and taking appropriate precautions;
> traveling in unfamiliar places; and maintaining socially appropriate behavior.  He
> has serious limitations of his ability to sustain an ordinary routine without special
> supervision; perform at a consistent pace without an unreasonable number and
> length of rest periods; and carry out detailed instructions.  The placement of some
> of Dr. Vellanki' s checkmarks on the form indicates the claimant has "limited but
> satisfactory" to nearly serious limitations for handling normal work stress and
> completing a normal workday or workweek without interruptions from
> psychologically based symptoms; adhering to basic standards of neatness and
> cleanliness.  For the psychiatric review technique, Dr. Vellanki indicates the
> claimant has no more than mild restriction of activities of daily living; moderate
> difficulties maintaining social functioning; moderate difficulties in maintaining
> concentration, persistence, or pace; and from 1 to 3 repeated episodes of
> decompensation , each of extended duration, based on the placement of the
> checkmark on the form.  Finally, according to Dr. Vellanki, the claimant has no
> useful ability to use public transportation, but based on the finding that the

claimant has a "none to mild" limitation in activities of daily living and the relatively minor social limitations noted above, this limitation is not fully explained or supported.

In the second medical source statement dated January 8, 2015, Dr. Vellanki opined that the claimant has no limitation on his ability to understand, remember , and carry out simple instructions; mild difficulties making judgments on simple work related decisions; moderate to marked difficulties with complex instructions and judgments on such tasks; no limitations on interacting with the public or co-workers; mild limitation on interaction with supervisors; mild to moderate limitation of his ability to respond appropriately to usual work situations and to changes in a routine work setting (Exhibit 14F).  He provided no narrative assessment and no information about the claimant's current symptoms, medication, or other treatment.

The undersigned finds that the first medical source statement from Dr. Vellanki is not fully supported by the documented improvement from Coleman Behavioral Health and the claimant's own statements regarding the positive changes he has made in his life that have affected him physically and mentally.  Finally, the undersigned notes that the two statements have significant differences.  One could assume they are different because of the improvement noted in other records, but Dr. Vellanki fails to provide an explanation, which decreases the reliability of the assessment.  Nonetheless, considering the second assessment is more consistent with the observations and clinical notes from the claimant's counselor at Coleman, Mr. Adam Rebh, and the undersigned gives it moderate weight.  The first assessment is not fully supported and it is given little weight.

(Tr. 24-25.)

The ALJ also mentioned Dr. Vellanki's opinion in the context of evaluating Dr.

Andert's medical expert testimony, as follows:

During the supplemental hearing, Jeffrey Andert, Ph.D., testified that the claimant's major depressive disorder is of moderate severity based on multiple treatment notes from Coleman Behavioral Health.  He did not find sufficient documentation of an anxiety disorder to consider it a medically determinable impairment.  Dr. Andert opined that the claimant would be capable of 1-3 step tasks; would not be able to perform complex tasks or make decisions about them on a routine basis; would need a low-stress environment without high productivity or quota requirements; would be able to have contact with others more than occasionally, at approximately the 80% range,  to the extent that he would essentially have only mild restriction of his social interaction.  The claimant's ability to maintain concentration, persistence, or pace is not marked,

37

and results in no more than moderate limitation.  Dr. Andert further opined that
the claimant is less limited than the assessment provided by Dr. Vellanki
suggests.  For example, Dr. Vellanki opined that the claimant has repeated
episodes of decompensation, each of extended duration, which Dr. Andert did not
find (Exhibit 9F).  Dr. Andert also found no pattern or behavior that would result
in more than one absence per month related to mental impairments, whereas Dr.
Vellanki at one time believed the claimant would have more absences from work.
Overall, the undersigned finds Dr. Andert's expert testimony is given substantial
weight because it was based on a thorough review and discussion of the medical
evidence of record.  The undersigned finds the residual functional capacity in this
decision is consistent with his testimony.

(Tr. 25.)

The ALJ formulated an RFC with the following mental limitations: "[claimant] is

limited to simple, routine, and repetitive tasks of up to three steps; needs a work environment

involving only occasional decision making, occasional changes in the work setting, and no strict

quota requirements; and can have frequent interaction with the public, co-workers, and

supervisors."  (Tr. 20.)

Upon careful review, the Court finds the ALJ failed to sufficiently acknowledge Dr.

Vellanki's January 8, 2015 opinion.  As discussed *supra*, Dr. Vellanki submitted three medical

opinions regarding Gamble's mental functioning: (1) the April 17, 2014 opinion, which is

marked in the administrative record as "Exhibit 9F;" (2) the January 8, 2015 opinion, marked as

"Exhibit 12F;" and (3) the January 28, 2015 opinion, marked as "Exhibit 14F."  (Tr. 503-508,

657-662, 665-667.)  The ALJ decision, however, indicates Dr. Vellanki "submitted **two** medical

source statements on the claimant's behalf," and only goes on to expressly identify and discuss

two of Dr. Vellanki's three opinions. (Tr. 24) (emphasis added).

Specifically, the ALJ first discusses Dr. Vellanki's April 2014 opinion (Exhibit 9F),

according it "little weight" because it "is not fully supported by the documented improvement

38

from Coleman Behavioral Health and the claimant's own statements regarding the positive

changes he has made in his life that have affected him physically and mentally."  (Tr. 25.)  The

ALJ then discusses Exhibit 14F, which the ALJ mistakenly identifies as the January 8, 2015

opinion but which actually corresponds to Dr. Vellanki's January 28, 2015 opinion.[13]  (Tr. 24.)

The ALJ accorded "moderate weight" to the January 28, 2015 opinion, finding it was "more

consistent with the observations and clinical notes from the claimant's counselor at Coleman,

Mr. Adam Rebh."  (Tr. 25.)  Nowhere in the decision, however, does the ALJ explicitly

reference the existence of a third medical source opinion from Dr. Vellanki.  Nor does the

decision cite Exhibit 12F, which correlates to the January 8, 2015 opinion.

 The Commissioner argues that "the ALJ discussed Dr. Vellanki's January 8, 2015

opinion (contained in Exhibit 12F) in the context of Dr. Andert's medical expert testimony,

which included testimony about Exhibit 12F."  (Doc. No. 17 at 9-10.)  It is true that, during the

June 2015 hearing, Dr. Andert indicated he had reviewed all three of Dr. Vellanki's opinions and

explicitly testified regarding his assessment of Exhibit 12F, i.e., the January 8, 2015 opinion.

(Tr. 42-45.)  Moreover, in discussing Dr. Andert's testimony, the ALJ decision references the

fact that "Dr. Vellanki at one time believed the claimant would have more [than one] absences at

work," an apparent reference to the January 8, 2015 opinion.  (Tr. 25.)  Thus, it appears the ALJ

was aware of the existence of Dr. Vellanki's January 8, 2015 opinion.

 However, the fact that the record suggests the ALJ was generally aware of Dr.

---

[13]  Both parties agree that the ALJ misstates the date of the second Dr. Vellanki medical
opinion discussed in the decision, and that the ALJ's discussion of that opinion relates to
the January 28, 2015 opinion set forth at Exhibit 14F.  (Doc. No. 14 at 10; Doc. No. 17 at
9.)

Vellanki's opinion is not, in and of itself, sufficient to satisfy the treating physician rule.  Nor is Dr. Andert's testimony regarding Dr. Vallenki's opinions sufficient to satisfy the ALJ's obligations to acknowledge treating physician opinions and articulate good reasons for discounting them to the extent they are not given controlling weight.  Thus, the Court finds the ALJ erred by failing to clearly identify and acknowledge Dr. Vellanki's January 8, 2015 opinion in the decision.

This does not end the inquiry, however.  As noted above, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may constitute harmless error where "the Commissioner has met the goal of § 1527(d)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation."  *Wilson*, 378 F.3d at 547.  *See also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); *Nelson*, 195 Fed. Appx. at 470–471; *Hall*, 148 Fed. Appx. at 464.  The Sixth Circuit has elaborated on this exception in a series of cases:

> Two recent cases interpreting this harmless-error exception help to outline its contours.  One is *Hall v. Comm'r of Soc. Sec*., 148 Fed. Appx. 456, 461–62 (6th Cir.2005), where this court considered the Commissioner's argument that the ALJ's failure to directly address the conclusions of a treating physician amounted to harmless error.  *Hall* involved a claimant who asserted total disability based on both physical and psychological impairments.  *Id*. at 458. The ALJ addressed the opinion of Hall's treating physician in the course of discussing Hall's psychological impairment, but failed to address the physician's findings with regard to Hall's physical limitations.  *Id*. at 463.  Two particular aspects of the ALJ's decision troubled the court.  First, the court emphasized that the ALJ's decision was inconsistent in that it accepted the treating physician's opinion in some respects but rejected it in others without explanation.  *Id.* at 465.  The court also noted that, although the ALJ addressed other medical opinions related to Hall's physical limitations, none of them supported the specific RFC that the ALJ ultimately adopted.  *Id*. at 465–66.  Because the court was unable to discern the ALJ's reasons for the weight that he gave to the opinion of Hall's treating physician, the § 1527(d)(2) violation necessitated a remand.  *Id*. at 467.

40

In contrast, this court in *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 472 (6th Cir.2006) (per curiam ), held that the ALJ's failure to abide by the letter of § 1527(d)(2) amounted to harmless error.  The court determined that the ALJ's analysis satisfied the goals of § 1527(d)(2) by "indirectly attacking" the treating physicians' opinions.  *Id* at 471.  In *Nelson*, the ALJ had briefly referred to the opinions of two of the claimant's treating physicians, but had not fully explained why he accorded them little weight as required by § 1527(d)(2).  *Id* at 470.  Nevertheless, the court held that those brief references, which arose in the context of discussing a multitude of contrary medical evidence, met the regulatory goal of addressing the opinions of the treating sources as well as their inconsistency with the record as a whole.  *Id*. at 472.

*Bowen*, 478 F.3d at 747–748.  *See also Hernandez v. Comm'r of Soc. Sec*., 644 Fed. Appx. 468, 474 (6th Cir. March 17, 2016); *Taynor v. Colvin*, 2014 WL 2580085 at * 13 (N.D. Ohio June 9, 2014).

Here, the Court finds the ALJ's failure to explicitly acknowledge Dr. Vellanki's January 8, 2015 constitutes harmless error.  Specifically, the Court finds the ALJ's evaluation of the medical and opinion evidence regarding Gamble's mental impairments (including Dr. Vellanki's April 2014 and January 28, 2015 opinions and Dr. Andert's hearing testimony) indirectly attacks both the supportability of Dr. Vellanki's January 8, 2015 opinion and the consistency of that opinion with the rest of the record evidence.

First, as the Commissioner correctly notes, Dr. Vellanki's April 2014 and January 8, 2015 opinions are identical in many respects.  Both opinions offer a diagnosis of Major Depressive Disorder, Recurrent, Unspecified; assess a GAF of 50; and identify the same mental health "signs and symptoms," including decreased energy, emotional withdrawal, difficulty concentrating, memory impairment, mood disturbance and easy distractibility.  (Compare Tr. 503-504 and Tr. 657-658.)  In addition, both opinions conclude that Gamble:

- has an "unlimited or very good" ability to (1) understand, remember, and carry out very short and simple instructions; (2) make simple work-

41

related decisions; (3) ask simple questions or request assistance; (4) be aware of normal hazards and take appropriate precautions; and (5) maintain socially appropriate behavior;

- has an "unlimited or very good" to "limited but satisfactory" ability to (1) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and (2) travel in unfamiliar places;

- has a "limited but satisfactory" ability to (1) remember work like procedures; (2) maintain attention for two hour segments; (3) maintain regular attendance and be punctual within customary, usually strict tolerances; (4) accept instructions and respond appropriately to criticism from supervisors; (5) respond appropriately to changes in a routine work setting; and (6) interact appropriately with the general public;

- has a "limited but satisfactory" to "seriously limited" ability to (1) deal with work stress; (2) understand and remember detailed instructions; (3) set realistic goals or make plans independently of others; and (4) deal with stress of semiskilled and skilled work;

- is "seriously limited" in his abilities to (1) sustain an ordinary routine without special supervision, (2) perform at a consistent pace without an unreasonable number and length of rest periods; and (3) carry out detailed instructions;

- has "no useful ability" to use public transportation;

- has mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning; and

- would likely experience between one and three episodes of decompensation within a 12 month period, each of at least two weeks duration.

(Compare Tr. 504-507 and Tr. 659-662.)

In evaluating Dr. Vellanki's April 2014 opinion, the ALJ acknowledged the above restrictions and discounted them to the extent they were inconsistent with the RFC.  The ALJ provided several reasons for doing so.  First, the ALJ discounted Dr. Vellanki's more restrictive limitations on the grounds they were "not fully supported by the documented improvement from

42

Coleman Behavioral Health and the claimant's own statements regarding the positive changes he has made in his life that have affected him physically and mentally."  (Tr. 25.)  Second, the ALJ noted Dr. Vellanki's opinion was internally inconsistent, explaining "according to Dr. Vellanki, the claimant has no useful ability to use public transportation, but based on the finding that the claimant has a 'none to mild' limitation in activities of daily living and the relatively minor social limitations noted above, this limitation is not fully explained or supported."  (Tr. 24.)  Third, the ALJ found Dr. Andert's testimony was entitled to greater weight as compared to Dr. Vellanki's April 2014 opinion.  (Tr. 25.)  He noted Dr. Andert "opined that the claimant is less limited than the assessment provided by Dr. Vellanki suggests," and concluded Dr. Andert's opinion was better supported by the medical evidence of record and therefore entitled to "substantial weight."  (*Id.*)

The ALJ's reasons for rejecting the restrictions set forth in Dr. Vellanki's April 2014 opinion (and implicitly the same restrictions in Dr. Vellanki's January 8, 2015) are supported by substantial evidence in the record.  As noted *supra*, Counselor Rebh's numerous treatment notes from May 2013 through June 2015 consistently note normal examination findings, including: (1) well groomed appearance, (2) average demeanor, (3) cooperative behavior, (4) average eye contact, (5) average motor activity, (6) clear speech, (7) euthymic/relaxed mood, (8) full affect, (9) logical thought process, (10) no impairment in memory, attention, and/or concentration, (11) fair insight, and (12) good judgment.  (Tr. 433-453, 541-555, 556-567, 568-629, 679-702, 716-731.)  Dr. Vellanki's mental status examination findings were also largely normal during this time period.  Specifically, Dr. Vellanki examined Gamble on seven occasions between May 2013 and June 2015, and each time noted Gamble was casually dressed and well oriented with

43

average demeanor/behavior, good eye contact, clear speech, full affect, logical thought process, normal thought content, and fair insight and judgment.  (Tr. 490-497, 636-640, 641-645, 646-650, 651-655, 669-673, 674-678, 732-737.)

Moreover, while Counselor Rebh's and Dr. Vellanki's treatment notes reflect some fluctuation in Gamble's symptoms, substantial evidence supports the ALJ's conclusion Gamble improved over time and affected "positive changes" both physically and mentally.  (Tr. 25.)  As set forth above, by mid-2014, Gamble reported making progress with improved self-esteem, decreased symptoms, and "overall satisfaction with growth and developments."  (Tr. 592-594, 597, 601.)  In September 2014, Dr. Vellanki found Gamble was "less depressed and less irritable" with medication compliance.  (Tr. 654.)  In November 2014, Gamble indicated "this is the happiest I've been in awhile."  (Tr. 624.)  In early 2015, Gamble reported working at DJ gigs with a friend and planning a birthday celebration.  (Tr. 693.)  In the months that followed, Gamble reported "doing well" and improving his lifestyle by eating healthier, exercising regularly, joining a gym, taking his medication as directed, and attending to "personal well-being and interpersonal relationships."  (Tr. 718, 720, 722, 726, 730.)

In light of the above, the Court finds the ALJ articulated "good reasons" for rejecting Dr. Vellanki's April 2014 opinion and, further, that those reasons are supported by substantial evidence in the record.  Thus, to the extent the restrictions set forth in Dr. Vellanki's April 2014 and January 8, 2015 opinions overlap and were not incorporated in the RFC, the Court finds the ALJ indirectly attacked both the consistency of those restrictions with other record evidence and their supportability.

The Court further finds that, to the extent Dr. Vellanki's January 8, 2015 opinion

44

contained restrictions greater than those set forth in the April 2014 opinion, the ALJ implicitly provided sufficient reasons for discounting those restrictions.  The first significant difference between the two opinions relates to Dr. Vellanki's assessment of Gamble's predicted work absences.  While the April 2014 opinion concluded Gamble would miss one day of work per month due to his mental impairments, the January 8, 2015 opinion found he would be absent about three times per month.  (Tr. 508, 662.)  The Court finds the ALJ acknowledged Dr. Vellanki's more restrictive opinion regarding Gamble's predicted absences and provided sufficient reasons for discounting it.  Specifically, in discussing Dr. Andert's testimony, the ALJ recognized that "Dr. Vellanki at one time believed the claimant would have more [than one] absences from work."  (Tr. 25.)  The ALJ expressly rejected this opinion, however, noting "Dr. Andert found no pattern or behavior that would result in more than one absence per month related to mental impairments."  (*Id.*)  The ALJ explained he found Dr. Andert's opinion on this issue was entitled to greater weight because it was "based on a thorough review and discussion of the medical evidence of record," which did not support such a restrictive limitation in light of treatment records documenting Gamble's improvement.  (*Id.*)

The only other significant difference[14] between the April 2014 and January 8, 2015 opinions relates to Dr. Vellanki's opinions as to the severity of Gamble's restrictions in maintaining concentration, persistence, or pace.  (Tr. 507, 661.)  While the April 2014 opinion

---

[14]  The Court notes that, in his January 8, 2015 opinion, Dr. Vellanki finds Gamble slightly more limited in his abilities to adhere to basic standards of neatness and cleanliness, and complete a normal workday and workweek without interruptions from psychologically based symptoms.  The differences between the April 2014 and January 8, 2015 opinions with respect to these issues is not substantial, however, and the Court finds the ALJ's discussion of the medical evidence and Dr. Andert's testimony implicitly attacks the consistency and supportability of these restrictions.

concluded Gamble was moderately limited in this area, the January 8, 2015 opinion found a "marked"[15] limitation.  Here again, the ALJ appears to have acknowledged Dr. Vellanki's more restrictive limitation in the context of discussing Dr. Andert's testimony.  Specifically, the ALJ states "the claimant's ability to maintain concentration, persistence, or pace is not marked, and results in no more than moderate limitations," explaining a moderate limitation in this area is consistent with Dr. Andert's testimony and the medical evidence of record.  (Tr. 25.)

Thus, reading the decision as a whole, it is clear that, while the decision failed to explicitly identify Dr. Vellanki's January 8, 2015 opinion, the ALJ nonetheless considered the restrictions set forth in that opinion and discounted them as inconsistent with (1) Gamble's documented improvement as reflected in treatment records from Coleman Behavioral Health; (2) Gamble's own statements regarding the positive changes he has made in his life both physically and mentally; and (3) Dr. Andert's medical expert testimony.  As noted *supra,* these reasons are supported by substantial evidence in the record.  Thus, the Court finds the ALJ acknowledged the more restrictive aspects of Dr. Vellanki's January 8, 2015 opinion and adequately addressed them by attacking both the consistency of those restrictions with the other record evidence and their supportability.  The ALJ implicitly provided good reasons for discounting those opinions to the extent they were inconsistent with the RFC.

Gamble argues, however, that remand is required because Dr. Vallenki's January 8, 2015 opinion "provides both support and consistency" with his April 2014 opinion.  He

---

[15]  The form explains that "marked" means "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such to seriously interfere with the ability to function independently, appropriately, effectively, on a sustained basis."  (Tr. 661.)

46

maintains that "had the ALJ been aware of the second medical source statement he may have found Dr. Andert's testimony inconsistent." (Doc. No. 18 at 2.)  For the following reasons, Gamble's argument is not persuasive.

As noted above, Dr. Vallenki's April 2014 and January 8, 2015 opinions were, indeed, identical in many respects, with the latter opinion more restrictive than the former in only a handful of categories.  Dr. Vallenki's January 28, 2015 opinion, on the other hand, was both less extensive and less restrictive than either of his previous two opinions.  The ALJ noticed this discrepancy, remarking that Dr. Vellanki's April 2014 opinion was "significantly different" from his January 28, 2015 opinion.  (Tr. 25.)  The ALJ stated "one could assume they are different because of the improvement noted in other records, but Dr. Vallenki fails to provide an explanation, which decreases the reliability of the assessment."  (*Id*.)  As the ALJ found the January 28, 2015 opinion "more consistent with the observations and clinical notes from the claimant's counselor . . . Adam Rebh," the ALJ accorded the January 28, 2015 opinion "moderate weight."  (*Id*.)

The Court rejects Gamble's argument that, had the ALJ been aware of the January 8, 2015 opinion, he would have found Dr. Vellanki's April 2014 more credible and accorded it greater weight.  First of all, as noted above, the ALJ addressed (either directly or indirectly) all of the restrictions set forth in the January 8, 2015 opinion and (to the extent they were inconsistent with the RFC) rejected them as inconsistent with treatment records showing Gamble's improvement with medical compliance and therapy, Gamble's own statements regarding the positive changes in his life, and Dr. Andert's medical expert testimony.  Second, Dr. Vellanki's January 8, 2015 opinion suffers from the same defect as the April 2014 opinion;

47

i.e., it is significantly more restrictive than the January 28, 2015 opinion with no explanation offered for the discrepancy.  Indeed, if anything, this discrepancy is more pronounced with regard to Dr. Vellanki's January 8, 2015 opinion as it was authored only twenty days before his markedly less restrictive January 28, 2015 opinion.

Lastly, the Court notes the ALJ accounted for Gamble's mental impairments by limiting him to simple, routine and repetitive tasks of up to three steps; a work environment involving only occasional decision making, occasional changes in the work setting, and no strict quota requirements; and frequent interaction with the public, co-workers, and supervisors.  (Tr. 20.) Gamble does not identify any additional restrictions that he believes should have been incorporated into the RFC.

Certainly, it would have been preferable for the ALJ to explicitly identify Dr. Vallenki's January 8, 2015 opinion in the decision.  However, under the particular circumstances presented, the Court finds the ALJ's failure to do so constitutes harmless error.  The ALJ acknowledged Dr. Vallenki as Gamble's treating psychiatrist and recognized Gamble's lengthy treatment history with him at Coleman Behavioral Health.  (Tr. 22-25.)  Moreover, as discussed above, Dr. Vallenki's April 2014 and January 8, 2015 opinions were identical in most respects and, in discussing the former opinion, the ALJ articulated several good reasons for according the restrictions offered by Dr. Vellanki little weight to the extent they were inconsistent with the RFC.  Further, to the extent the January 8, 2015 opinion was more restrictive than the April 2014 opinion, the ALJ indirectly attacked the consistency and supportability of that opinion as discussed above and, indeed, expressly rejected that opinion's restrictions regarding predicted absences and concentration, persistence, and pace.  In so doing, the ALJ "met the goal of §

48

1527(d)-the provision of the procedural safeguard of reasons-even though [he] has not complied with the terms of the regulation."  *Wilson*, 378 F.3d at 547.  *See also Friend*, 375 Fed. Appx. at 551 ("[i]f the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.")

Accordingly, and for all the reasons set forth above, Gamble's first assignment of error is without merit.

### Medically Determinable Impairment

In his second assignment of error, Gamble argues remand is required because the ALJ improperly determined his anxiety was not a "medically determinable impairment."  (Doc. No. 14 at 13-18.)  He maintains "the ALJ's conclusion is not supported by the overall evidentiary record that contains multiple diagnoses and numerous references to the impairment."  (*Id.* at 14.)  According to Gamble, the record reflects he was diagnosed with anxiety in September 2013 and thereafter received treatment and counseling for that condition.  Thus, he maintains the ALJ was required to consider and evaluate this mental impairment at later steps in the sequential evaluation, but failed to do so.  The Commissioner argues there is not sufficient evidence in the record to establish Gamble's anxiety constituted an medically determinable impairment.

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities

49

which can be shown by medically acceptable clinical and laboratory techniques.  Social Security

Ruling ("SSR") 96–4P, 1996 WL 374187, at *1 (S.S.A. July 2, 199).  A physical or mental

impairment must be established by medical evidence consisting of signs, symptoms and

laboratory findings.  *Id.*

> Further, the regulations require "evidence from 'acceptable medical sources' to establish
the existence of a medically determinable impairment."  S.S.R. 06–03P, 2006 WL 2329939, at
*2; 20 CFR 404.1513(a) and 416.913(a).  "[U]nder no circumstances may the existence of an
impairment be established on the basis of symptoms alone."  SSR 96–4P, 1996 WL 374187, at
*1 (S.S.A. July 2, 1996).  Thus, "regardless of how many symptoms an individual alleges, or
how genuine the individual's complaints may appear to be, the existence of a medically
determinable physical or mental impairment cannot be established in the absence of objective
medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote
omitted).  *See also* 20 C.F.R. §§ 404.1529(b) and 416.929(b) ("Your symptoms . . .  will not be
found to affect your ability to do basic work activities unless medical signs or laboratory
findings show that a medically determinable impairment(s) is present.").  *See also Torrez v.
Comm'r of Soc. Sec.*, 2017 WL 749185 at * 6 (N.D. Ohio Feb. 6, 2017) *report and
recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v.
Comm'r of Soc. Sec.*, 2017 WL 655402 at * 8 (S.D. Ohio Feb. 17, 2017) *report and
recommendation adopted by* 2017 WL 1187919 (S.D. Ohio March 30, 2017).  The claimant
bears the burden of establishing the existence of a medically determinable impairment.  *See* 42
U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he
furnishes such medical and other evidence thereof as the Secretary may require.")  *See also*

*Kavalousky v. Colvin*, 2013 WL 1910433 at * 7 (N.D. Ohio April 19, 2013) *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Here, at step two, the ALJ determined Gamble's diabetes mellitus, obesity, right elbow tendinitis, and major depressive disorder constituted severe medically determinable impairments. (*Id*.)  The ALJ concluded, however, that Gamble's anxiety did not constitute a medically determinable impairment, explaining as follows:

> Dr. Andert testified that the anxiety disorder mentioned briefly in the record is not confirmed and his testimony indicates this impairment is not medically determinable.  State agency consultative examiner, Dr. Lyall, found the claimant has a depressive disorder, and did not include an anxiety disorder in the assessment (Exhibit 6F).  In the first hearing, the claimant testified that he has panic attacks and other anxiety-related symptoms, but there is no indication these symptoms have been observed or documented by acceptable medical sources.  Overall, the undersigned finds the medical evidence does not provide any evidence of signs, symptoms, and laboratory findings to support anxiety as a medically determinable impairment.

(Tr. 17.)

The Court finds Gamble has not carried his burden of establishing anxiety as a medically determinable impairment.  Dr. Vellanki's treatment records from September 2013 to June 2015 consistently diagnosed major depressive disorder and did not diagnose anxiety disorder.  (Tr.  490-497, 636-639, 641-645, 646-650, 651-655, 669-673, 674-677, 732-737.)  Moreover, neither Dr. Vellanki, Dr. Lyall, or Dr. Andert included an anxiety-related diagnosis as part of their medical opinions.  (Tr. 39-40, 419, 503-508, 657-662, 665-667.)  Indeed, the ALJ correctly notes Dr. Andert expressly testified Gamble's anxiety did not constitute a "medically determinable impairment" during the relevant time period.  (Tr. 39-40.)

Gamble argues the ALJ erred in relying on Dr. Andert's testimony because the record contains "multiple diagnoses and references to anxiety, such as chest pain, panic attacks, and

51

trouble breathing from Dr. Fracasso, Mr. Gamble's treating physician."  (Doc. No. 14 at 15.)

The records relied on by Gamble, however, are dated from early 2011 to July 2012, well prior to

the May 2013 onset date in this case.  Moreover, while more recent treatment notes from Dr.

Vellanki and Counselor Rebh indicate Gamble sometimes complained of anxiety and anxiety-

related symptoms, it is well-established the existence of a medically determinable impairment

may not be established on the basis of symptoms alone.  SSR 96–4P, 1996 WL 374187 at *1

(S.S.A. July 2, 1996).  The fact Dr. Vellanki did not assess an anxiety disorder, despite Gamble's

complaints of anxiety related symptoms, lends further support to the ALJ's determination that

this condition did not constitute a medically determinable impairment for purposes of social

security regulations.[16]

Gamble asserts, however, the ALJ erred because Dr. Fracasso diagnosed him with

anxiety in September 2013.  (Doc. No. 14 at 15.)  In support of this argument, Gamble cites an

unsigned, undated questionnaire included in records received from Dr. Fracasso's office.  (Tr.

402-403.)  This questionnaire indicates Gamble was first seen in March 2012 and last seen on

September 12, 2013, and identifies diagnoses of uncontrolled diabetes, depression, cellulitis,

obesity, and anxiety.  (Tr. 402.)

The Court finds this document is insufficient to carry Gamble's burden of

demonstrating his anxiety constitutes a "medically determinable impairment."  First, although

included in an Exhibit containing treatment records from Dr. Fracasso's office, the document

cited by Gamble is not signed or dated and, therefore, of questionable value.  More significantly,

_____

[16] Indeed, the Court notes that, in his April 2014 and January 8, 2015 opinions, Dr.
Vellanki declined to identify "generalized persistent anxiety" or "recurrent severe panic
attacks" as among Gamble's mental health signs and symptoms.  (Tr. 504, 658.)

the Court notes Dr. Fracasso submitted a signed and dated "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" on September 27, 2013, in which he indicates Gamble suffers from depression but does not identify a diagnosis of anxiety disorder.  (Tr. 499-500.) Moreover, none of Dr. Fracasso's treatment notes from February 2013 through May 2015 diagnose an anxiety-related disorder or identify anxiety as part of Gamble's past medical history. (Tr. 389-390, 404-405, 510-511, 512-513, 514-515, 518-519, 520-521, 526-527, 529-530, 704-705, 739-740, 741-742.)

In light of the above, the Court finds substantial evidence supports the ALJ's conclusion that Gamble's anxiety did not constitute a medically determinable impairment.  Nonetheless, the Court notes that, at step four, the ALJ acknowledged Gamble's February 2015 testimony that he suffered from panic attacks and anxiety.  (Tr. 22-23.)  The ALJ, however, noted evidence of Gamble's subsequent improvement, including evidence he is "getting out of the house daily," "very active both physically and socially," and "actively working on improving his health, . . . socializing regularly, and . . . making time for hobbies and interests."  (Tr. 23.)  Moreover, the Court again notes the ALJ accounted for Gamble's mental impairments by limiting him to simple, routine and repetitive tasks of up to three steps; a work environment involving only occasional decision making, occasional changes in the work setting, and no strict quota requirements; and frequent interaction with the public, co-workers, and supervisors.  (Tr. 20.) Gamble does not identify any additional restrictions that he believes should have been incorporated into the RFC to account for his alleged anxiety.

Accordingly, and for all the reasons set forth above, the Court finds Gamble's second

assignment of error is without merit.[17]

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.


_s/Jonathan D. Greenberg_____
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 16, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**

---

[17]Gamble also asserts, summarily, that the ALJ's credibility analysis is flawed.  (Doc. No.
14 at 17.)  He asserts "because of the ALJ's improper dismissal of Mr. Gamble's anxiety
as a medically determinable impairment, he was able to discredit Mr. Gamble due to his
work history because, without recognizing anxiety as a legitimate impairment, there was
no medical reason for his absenteeism."  (*Id*.)  As the ALJ properly determined Gamble's
anxiety was not a medically determinable impairment, the Court need not reach this
issue.Nonetheless, the Court notes the ALJ did not rely entirely on Gamble's work
history in assessing his credibility.  Rather, the ALJ properly considered that "the
medical evidence submitted after the hearing shows the claimant is now capable of being
'very active" and "the claimant's own statements to his counselor show that with greater
compliance and efforts to improve his health, his general condition has improved."  (Tr.
26.)